THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, v LUIS MARIN, Respondent; KAYE, SCHOLER, FIERMAN, HAYS & HANDLER, Appellant.

Second Department, March 30, 1982

APPEARANCES OF COUNSEL

*Kaye, Scholer, Fierman, Hays & Handler* (*Paul J. Curran* and *Bruce Margolius* of counsel), appellant *pro se*.

*J. Radley Herold* and *Howard L. Dryer* for respondent.

OPINION OF THE COURT

*Per Curiam.*

On December 4, 1980 a tragic and fatal fire occurred at the Stouffer Inn in Westchester County. On December 5, 1980 Stouffer engaged the law firm of Kaye, Scholer, Fierman, Hays & Handler (Kaye Scholer) to represent it in all facets of both the civil litigation and criminal investigation, and proceedings which were anticipated as a result of the fire. During the course of its representation of Stouffer, Kaye Scholer attended interviews of Stouffer employees which were conducted by the Westchester County District Attorney's office as part of its investigation. A stenographer from the Westchester County Department of Public Safety, acting for the District Attorney's office, took notes of the interviews. Kaye Scholer and its representatives also took notes at these interviews, but these notes, which were later incorporated into typed memoranda, were not verbatim.

In April, 1981, Luis Marin, a former Stouffer employee, was indicted for arson and murder in connection with the fire. Subsequent to the indictment, counsel for Marin requested that Stouffer make available nine Stouffer employees for interviews by him. Two of the nine employees were subsequently interviewed by defense counsel. On March 3, 1982 counsel for defendant Marin served Kaye Scholer with a trial subpoena duces tecum dated March 1, 1982 seeking the production of "[c]opies of * * * interviews" of 14 specifically named Stouffer employees.

By order to show cause dated March 10, 1982 Kaye Scholer moved to quash the trial subpoena duces tecum arguing, *inter alia,* that the materials sought to be produced (1) constituted the work product of attorneys and (2) were not relevant or necessary in defending the defendant in the criminal trial.

After a hearing conducted upon Kaye Scholer's motion to quash, the County Court entered an order limiting the scope of the subpoena to Kaye Scholer's summaries of the interviews conducted by the District Attorney of 11 of the 14 named Stouffer employees. The County Court also directed that "comments and notations which constitute the

work product or opinions of attorneys" could be redacted by Kaye Scholer.

It is from the former aspect of the County Clerk's order that Kaye Scholer now appeals.

### APPEALABILITY

The threshold issue before this court is whether an appeal lies from so much of the order of the County Court as denied, in part, Kaye Scholer's motion to quash a trial subpoena duces tecum.

It has been consistently held that the denial of an application to quash a Grand Jury subpoena, i.e., a subpoena issued in the course of a criminal investigation, whether entered by a court possessing both criminal and civil jurisdiction, or by a court possessing criminal jurisdiction only, is a final and appealable order (*People v Doe,* 247 App Div 324, affd 272 NY 473; *Matter of Boikess v Aspland,* 24 NY2d 136, 138-139; *Matter of Cunningham v Nadjari,* 39 NY2d 314; *State of New Jersey v Geoghegan,* 76 AD2d 894).

In his brief, counsel for defendant Marin argues that whatever the law may be with respect to the denial of an application to quash a Grand Jury subpoena, no appeal lies from a denial of a motion to quash a subpoena duces tecum issued during a criminal trial, even if the purported appellant is a third party who is aggrieved thereby.

We disagree with the broad principle advocated by counsel for the defendant. Concededly, there is authority for the proposition that no appeal may be taken by either of the immediate parties to an underlying criminal action from a denial of an application to quash a trial subpoena duces tecum, since the propriety of such an order can be resolved on the direct appeal from any resulting judgment of conviction (see *Matter of Morgenthau v Hopes,* 55 AD2d 255, mot for lv to app dsmd 41 NY2d 1007). However, the latter avenue of relief is totally unavailable to Kaye Scholer, who is clearly aggrieved by the County Court's order. Therefore, the denial of an appeal to the law firm at this juncture would irrevocably preclude it from any opportunity to vindicate its position before an appellate body, regarding the serious issues raised in its moving papers. The case of

*Matter of Superior Ct. of New Jersey (Jascalevich)* (63 AD2d 903) is not persuasive authority to the contrary. In that case, the court at Trial Term, New York County, entered an order pursuant to CPL 640.10 (Uniform act to secure the attendance of witnesses from without the State in criminal cases) directing the *New York Times* and one of its reporters, Myron Farber, to comply with a subpoena duces tecum requesting certain documents, which was returnable in the Superior Court of Bergen County, New Jersey. Both the *Times* and Farber appealed to the Appellate Division, First Department, which dismissed the appeal "as nonappealable". However, that case is clearly distinguishable on its facts. In *Matter of Superior Ct. of New Jersey (Jascalevich)* (*supra*), the *Times* and Farber had the right, despite the dismissal of the appeal to the First Department, to contest the validity of the challenged subpoena in the New Jersey courts and obtain appellate review of any adverse ruling in connection therewith. Indeed, this is precisely the course of action that was pursued by the *Times* and Farber and which ultimately led to the landmark decision of the New Jersey Supreme Court on the merits of the dispute (see *Matter of Farber,* 78 NJ 259, to be discussed, *infra*).

▮ Accordingly, we hold that the instant order of the County Court, Westchester County, is final as to Kaye Scholer and appealable (cf. *People v Still,* 48 AD2d 366).

THE MERITS

In discussing the merits of the instant appeal it must be initially stressed that, pursuant to *People v Rosario* (9 NY2d 286), the defendant had the right to see the prior transcribed statements and interviews given to the District Attorney by any Stouffer employee who later testified for the prosecution (cf. *People v Consolazio,* 40 NY2d 446). However, the order of the County Court under review, in directing production of Kaye Scholer's summaries of the interviews of Stouffer employees which were conducted by the District Attorney, clearly transcends the parameters of *Rosario,* and must be scrutinized accordingly.

There is no question that the materials directed to be produced by Kaye Scholer pursuant to the County Court's order clearly constituted attorney's work product pursuant

to CPLR 3101 (subd [c]) and is absolutely privileged in New York State, as opposed to the conditional privilege relating to material prepared for litigation contained in CPLR 3101 (subd [d]) (see *Kenford Co. v County of Erie*, 55 AD2d 466; Siegel, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C3101:26, pp 30-31).

Although there is some divergence among the Federal courts as to whether attorney's work product is absolutely or conditionally privileged (see *Matter of Grand Jury Investigation*, 599 F2d 1224, 1230), all these courts have spoken at some length about the attorney's work product privilege, and the particular factors which militate against its disclosure in all but a "rare situation" (*Hickman v Taylor*, 329 US 495, 513). In *Hickman v Taylor* (*supra*), the Supreme Court dealt with two types of work product. The defendant's attorney had taken written statements from a number of witnesses at the scene of a tug-boat accident. The court held (p 512) that plaintiff's "naked, general demand" for these written statements was insufficient to overcome work product protection. The burden was on plaintiff "to establish adequate reasons to justify production" of those statements (p 512). In *Hickman* the plaintiff also sought to discover the content of oral interviews with witnesses, some of which had been summarized in memoranda prepared by the defendant's attorney. The Supreme Court held that the latter should be given greater protection (*supra,* pp 512-513): "[A]s to oral statements made by witnesses to [defendant's attorney] whether presently in the form of his mental impressions or memoranda, we do not believe that any showing of necessity can be made under the circumstances of this case so as to justify production. Under ordinary conditions, forcing an attorney to repeat or write out all that witnesses have told him and to deliver the account to his adversary gives rise to grave dangers of inaccuracy and untrustworthiness. No legitimate purpose is served by such production. The practice forces the attorney to testify as to what he remembers or what he saw fit to write down regarding witnesses' remarks. Such testimony could not qualify as evidence; and to use it for impeachment or corroborative purposes would make the attorney much less an officer of the court and

much more an ordinary witness. The standards of the profession would thereby suffer."

Of even greater relevance to an understanding of the nature, scope and discoverability of attorney's work product is the case of *Matter of Grand Jury Investigation* (599 F2d 1224, *supra*). In that case, the Sun Company began an investigation in January, 1976 into possible illegal payments by some of its employees in connection with Sun's foreign operations. A standing committee of the corporation reported in July, 1976 that no significant violations had occurred. The investigation was subsequently reopened and Sun retained counsel to advise it of its legal obligations if proof of illegal payments turned up. The standing committee conducting the investigation also asked retained counsel to assist it.

Early in 1977, Sun's chairman of the board sent a questionnaire to 1,877 employees explaining the investigation and asking the employees to answer "yes", "no", or "conference" (if uncertain) to 10 questions which probed the employees' knowledge of the payments. Retained counsel then followed up the "yes" and "conference" responses, by conducting personal and telephone interviews, and reducing the notes and recollections of the interviews, which had not been transcribed, to memoranda. The standing committee eventually discovered questionable payments and amended its tax returns and Securities and Exchange Commission forms accordingly.

The United States Attorney then began an investigation and a Grand Jury subsequently issued a subpoena requesting, *inter alia*, all of the interview memoranda. In determining whether the interview memoranda constituted attorney's work product, the United States Court of Appeals focused on whether "in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained *because* of the prospect of litigation" (*Matter of Grand Jury Investigation, supra*, p 1229). After answering that question in the affirmative — and a similar answer is clearly called for in the case at bar — the Court of Appeals held (p 1231) that although attorney's memoranda summarizing interviews were not absolutely privileged as attorney's

work product, nevertheless they could not be classified together with material which fell within the purview of the conditional privilege of material prepared for litigation, by virtue of "several unique and well-documented problems", including the following: "First, they may indirectly reveal the attorney's mental processes, his opinion work product. *See, e.g., Hickman v. Taylor, supra,* 329 U.S. at 513, 67 S.Ct. 385; *In re Grand Jury Investigation (Sturgis) supra,* at 949. Second, their reliability as accurate reflections of the witness's statements is a function of many factors, including the conditions of the interview, the contemporaneousness of the writing, and the editorial discretion of the attorney. *See, e.g., Hickman v. Taylor, supra,* 329 U.S. at 512-13, 67 S.Ct. 385. Third, discovery and use of such material creates a danger of converting the attorney from advocate to witness. *See, e.g., United States v. Nobles, supra,* 422 U.S. at 252-53, 95 S.Ct. 2160 (White, J. concurring); *Hickman v. Taylor, supra,* 329 U.S. at 513, 67 S.Ct. 385. Finally, the information contained in such memoranda generally is of limited utility, especially where the witness himself is readily available to the opposing party. *See, e.g., Hickman v. Taylor, supra,* at 513, 67 S.Ct. 385. Although this list is not exhaustive, it does reflect many of the special considerations that must shape any ruling on the discoverability of interview memoranda like those at issue in this case. The result, we believe, is exactly that contemplated in *Hickman;* such documents will be discoverable only in a 'rare situation.' "

In holding that the Government had not demonstrated sufficient necessity or good cause to overcome the attorney work product privilege applicable to the interview memoranda prepared by counsel, the court rejected the Government's claim that the Grand Jury needed the subpoenaed memoranda to assess the credibility of various interviewees. Specifically, the court held (*Matter of Grand Jury Investigation, supra,* p 1233): "We do not believe, however, that the desire to impeach or corroborate a witness's testimony, by itself, would ever overcome the protection afforded the interview memoranda. This rule is implicit in *Hickman's* heightened protection of such material. See 329 U.S. at 512-13, 67 S.Ct. 385. As noted earlier, the testimo-

nial quality of an attorney's memorandum raises grave concerns not raised by a witness's written statement."

One of the most recent and comprehensive judicial examinations of the conflict between a defendant's Sixth Amendment rights of confrontation and compulsory process and the statutory privileges or constitutional rights asserted by third parties, is contained in the decision of the New Jersey Supreme Court in *Matter of Farber* (78 NJ 259, *supra*). In *Farber* the *New York Times* and Farber, a reporter employed by the newspaper, were held in contempt for failing to comply with two subpoenas duces tecum directing them to produce certain documents and materials compiled by them in the course of Farber's investigation of certain allegedly criminal activities. Farber's investigations and reporting had contributed largely to the indictment and prosecution of Dr. Mario E. Jascalewich for murder.

In rejecting Farber's argument that he had the absolute right to refuse to comply with the subpoenas based on his First Amendment rights and his statutory privilege under the New Jersey Shield Law, the Supreme Court of New Jersey held that the defendant's constitutional rights of confrontation and compulsory process could prevail, if the defendant could demonstrate "relevance, materiality, absence of less intrusive access, and need" (*Matter of Farber, supra,* p 275).

Specifically, the majority of the Supreme Court of New Jersey set forth the following procedural mechanism for resolving the conflicting claims raised by the criminal defendant and the third party from whom production is sought (pp 276-277): "The threshold determination would normally follow the service of a subpoena by a defendant upon a newspaper, a reporter or other representative of the media. The latter foreseeably would respond with a motion to quash. If the status of the movant — newspaper or media representative — were not conceded, then there would follow the taking of proofs leading to a determination that the movant did or did not qualify for the statutory privilege. Assuming qualification, it would then become the obligation of the defense to satisfy the trial judge, by a fair preponderance of the evidence including all reasonable

inferences, that there was a reasonable probability or likelihood that the information sought by the subpoena was material and relevant to his defense, that it could not be secured from any less intrusive source, and that the defendant had a legitimate need to see and otherwise use it." But the court followed this declaration with the following caveat (*supra,* p 277): "We wish to make it clear, however, that this opinion is not to be taken as a license for a fishing expedition in every criminal case where there has been investigative reporting, nor as permission for an indiscriminate rummaging through newspaper files." The courts of this State have also consistently held that a subpoena duces tecum may not be used as a fishing expedition for purposes of discovery or to ascertain the existence of evidence, but rather to compel the production of specific documents that are relevant and material to facts at issue in a pending judicial proceeding (*People v Gissendanner,* 48 NY2d 543; *People v Price,* 100 Misc 2d 372; *People v Hasson,* 86 Misc 2d 781; *People v Fraiser,* 75 Misc 2d 756).

■ An examination of the record herein reveals that counsel for the defendant failed to satisfy his burden as enunciated in *Matter of Farber* (*supra,* pp 276-277), of demonstrating "by a fair preponderance of the evidence including all reasonable inferences, that there was a reasonable probability or likelihood that the information sought by the subpoena was material and relevant to his defense, that it could not be secured from any less intrusive source, and that the defendant had a legitimate need to see and otherwise use it." On the contrary, during the hearing conducted on Kaye Scholer's motion to quash, defendant's counsel specifically stated that he was "not interested in those where they [Kaye Scholer] stood by and made notes to themselves as to the District Attorney's interviews as to those where he has called people. We have been given the Rosario material * * * I'm after individual statements which they took from employees in the absence of law enforcement people dealing with the facts going back to December 4". Later, during the hearing, counsel reversed himself and conceded that he was looking for "things * * * if it would form a link in the chain leading to admissible evidence."

We are well aware that, in large measure, the subpoena duces tecum in *Matter of Farber* (*supra*) was utilized for discovery purposes. However, an examination of the New Jersey Supreme Court's opinion in that case reveals that the court held that defendant had met the preliminary requirement for *in camera* inspection by stressing (p 277): "the factual background and \* \* \* the part Farber had played was intimate and pervasive. Perhaps most significant is the trial court's thorough awareness of \* \* \* Farber's close association with the Prosecutor's office since a time preceding the indictment. This glaring fact of their close working relationship may well serve to distinguish this case from the vast majority of others in which defendants seek disclosure from newsmen". The contrast between the record in *Matter of Farber* (*supra*) and that adduced at bar could not be more striking.

Accordingly, the order must be reversed insofar as appealed from, and Kaye Scholer's motion to quash must be granted.

DAMIANI, J. P., LAZER, MANGANO and GULOTTA, JJ., concur.

Motion by petitioner Kaye, Scholer, Fierman, Hays & Handler (Kaye Scholer) to stay enforcement of an order of the County Court, Westchester County, dated March 16, 1982, pending the determination of the appeal therefrom. The order, insofar as appealed from denied Kaye Scholer's motion to quash a subpoena served on it, by directing it to produce its summaries "of interviews conducted by the District Attorney [of Westchester County] or law enforcement officers" of 11 individual employees of the Stouffer Corporation (Stouffer).

The parties have consented that the arguments and papers submitted in support of, and in opposition to, the motion for the stay, should be deemed the arguments and papers with respect to the appeal.

Order reversed insofar as appealed from, on the law, without costs or disbursements, and petitioner's motion to quash granted.

The motion for a stay is dismissed as academic in light of the determination of the appeal.